May it please the Court, Deanne Maynard for the appellants. I would like to reserve five minutes for rebuttal if I may. The clock is counting down and that's just fine. Thank you, Your Honor. The District Court fundamentally misunderstood this Court's first opinion, believing it to foreclose the very Pike inquiry this Court remanded for it to consider. But as this Court's first opinion correctly recognized, the Court's opinion was not the end of the analysis. Yet the District Court felt that its hands were tied. And so all we're asking for today is simply a remand to go back to the District Court to allow it to consider the record evidence and weigh the burdens performed the Pike analysis. So does this mean that the District Court would have to conduct an evidentiary hearing, a trial? Possibly, but not necessarily, Your Honor. Both parties moved for cross – made cross motions for summary judgment. But at a minimum, it would have to determine whether on the evidence there were material disputes of fact and whether a trial was required. And here it didn't even do that. Do you think there's a trial that's required? Well – Is that your argument? No. Our primary argument below was that we should prevail on summary judgment, because here the benefits on interstate – the burdens on interstate Well, two points, Your Honor. As a matter of law, it isn't necessary for there to be exclusion, per se, as long as the burdens are substantially higher and that out-of-state Well, you keep using the term excluded. Well, I apologize if I – if I – if I haven't made myself clear.  I apologize if I haven't made myself clear. I have used that term. I think as a practical matter, they are excluded in the sense that they're placed at a – out-of-state entities are placed at a substantial competitive disadvantage. This is what's always bugged me about this case. These people – your clients are sort of incidentally out-of-state. I mean, they're out-of-state because they're incorporated out-of-state. They could be incorporated in-state, but they're operating widely in-state, right? They're here. They have stores. They have employees. They have people. They have – presumably have whatever political power that entails. I understand that there is case law recognizing perhaps just the fact that they are incorporated out-of-state, but that's all we've got here. The goods are flowing freely interstate. There's no problem there. All we've got is some people who happen to be incorporated out-of-state. Is that basically right? Well, two points – two responses to that, Your Honor. First, if that analysis were true, then no major corporation who's incorporated out-of-state could ever bring a dormant commerce clause challenge. No, no. It's not they could bring one. They can bring one. But the question is what is the impact on interstate commerce as a result of the fact these people happen to be incorporated out-of-state? Well, like, for example, in Exxon. Exxon is – obviously had retail stores in the State of Maryland, had people that probably lived in the State of Maryland that worked at their – But they were refineries. They were inherently out-of-state because they couldn't refine stuff in Maryland because there was no oil in Maryland. They were just – they were out-of-state entities that wanted to operate in-state for certain purposes. Except the claim there, Your Honor, was a retail claim.  I understand that. So, obviously, it's just like Linscrackers has stores and employees who were domiciled here. Linscrackers is an out-of-state entity. And I don't think the Supreme Court has ever drawn the line that you're drawing. And if it had, it would – But at the pike level, why isn't it relevant as to what is the burden on interstate commerce? What is the burden here on interstate commerce, actually? The burden here is that there's – if the restrictions are upheld, there will be a significant transfer of profits from out-of-state entities solely to in-state entities. The State is allowing, unlike in Exxon, unlike in any of the other cases they cite, the State is allowing the business model only for in-state entities and is excluding out-of-state entities. Well, it's true that the model is limited, I guess, and I don't really – I'm not sure about this either because no one's really discussed it. The optometrists are licensed in California, but the opticians are also licensed in California. So to that degree, they're both equally in-state. Now, what makes the optometrists inherently in-state any more than the optometrists – the opticians are inherently in-state? Well, I think the relevant inquiry is not a licensing one because that would be true in lots of businesses where the out-of-state entities are licensed. So what makes the optometrists inherently in-state? Residency, Your Honor. I think it's a residency requirement. Here the optometrists reside in California. They're California citizens. Do we know that? I mean, how do we know they don't live in Nevada? Some of them. I mean, in other words, there's nothing inherent about it. You're right, Your Honor, as a matter of theory, that there could be an optometrist who lives in Nevada who practices – who's licensed, practices in California. There's absolutely no evidence of that in the record. And any such in-state – out-of-state competition to the in-state optometrists would be de minimis if it existed. So here, unlike in Exxon, there's virtually no dispute that there would be no out-of-state entities who would step in to get the transfer of profits that are going to be taken away from the plaintiffs here if the restrictions are upheld. The tens of millions of dollars, if these plaintiffs are not allowed, and entities like them, out-of-state entities, to co-locate, is going to shift to in-state entities. I have another question, which is baffling about this case. You're talking in the hypothetical, and presumably that's because this hasn't happened. Now, why hasn't it happened? I mean, the fact that it hasn't happened, why are we worrying about it? I mean, you're saying this would happen, but you're also saying that this is the law in California. And yet, I gather that your people are there operating, doing exactly what you're saying they can't do. Well, that cuts in our favor, Your Honor, because that cuts against the State's interests. I mean, the interests here are illusory. The benefits to the State, there's been – in the 20 years that there have been co-location under the Knox-Keene plans, the State can point to actually no actual harm to anyone from that practice. Now, what we challenge here is the State's position is, Your Honor, that what we're doing, that we're not allowed to operate under the Knox-Keene Act in the way that we are, and that's the – that's what we're challenging. But you are, and nobody's stopping you. But you are, and no one's stopping you. Well, they claim that we can't operate in this fashion, and that's what we're challenging. We also have a challenge that even these restrictions, even the restrictions – even if we were allowed to practice under the Knox-Keene plan, the – you know, that, too, would be a burden on interstate commerce. But obviously, the burden is significantly higher if we aren't allowed to co-locate, which is the way that almost everyone purchases eyewear. I mean, it would be like saying that you can't – out-of-state company – out-of-state companies can't have ATMs, but they can have banks. I mean, every – everyone – the evidence is that 80 percent of Californians purchase their eyewear where they get their eye exams. And so to uphold these restrictions against the plaintiffs would be to shift the tens of millions of dollars of profits. And this is our expert's testimony. But again, the district court – I mean, I'm arguing the facts here, but really all we're asking is to be allowed to argue these facts to the district court. And he mistakenly thought – – Is the purpose of the government commerce clause to protect profits, or is it to protect against interstate interference? It's to protect against states burdening out-of-state entities in preference to in-state entities. And that's exactly what's happening here. But it's – what we're really talking about and what you're really talking about is profits, that the profits are going to be diminished. That isn't a problem for the interstate commerce clause or the government clause. It's not profits per se, Your Honor, that's the problem. It's that the business and the profits that result from that business will be transferred if the restrictions are upheld from out-of-state entities to in-state entities. And it's that transfer that is the burden, the impermissible burden. And the court's cases, the Supreme Court cases, continuously consider the cost to the plaintiff from the restrictions. And this is higher – and we have a footnote in our brief that talks about the burdens in Castle and the burdens in Pike. In today's dollars, the burdens here are substantially higher on these plaintiffs. And, of course, those plaintiffs prevailed in the Supreme Court. So we think we've done more than enough to entail us to have the court at least consider the evidence. To get a little abstract, how do you understand the interaction between the discrimination inquiry that we already did – but I'm not talking only about this case – and the Pike analysis? I mean, it seems like there's an enormous inherent overlap and or at least the disparate effects part of the discrimination analysis just falls into the Pike analysis in such a way that it's hard to see what is conceptually left. I mean, we've already decided that there's no – not only is there no facial discrimination, which was easy here, but that there was no cognizable disparate effect, as I understand it. So what – I understand we sent you back to find out what the burden is, but maybe it has to be a completely different burden than the ones we've already considered. That's essentially what Judge Carlton said. You couldn't have meant the same burden. You must have meant a different one. And that seems to me to have to do with the interaction between those – the two analyses. Well, I agree, Your Honor. And I think that the distinction that Judge Carlton missed is that in this – in this Court's first opinion, what the Court decided was that the State had proffered a basis to treat dispensing optometrists different from opticians. And so you concluded they were not similarly situated. And that answered for you the discrimination question. But that – what that did, and this is key, I mean, it didn't – it didn't – it had real effect because it saved the State from having to satisfy strict scrutiny, which I don't think they could have done. And now it placed us in pike. So you said go back and see if you can actually prove us the impermissible burdens and that they aren't outweighed by the putative benefits to the State. And that's all we're asking. Do you think it's a completely distinct and separate analysis? You don't – your answer wasn't quite responsive to Judge Prezon's question about the overlap. Well, I think it's a distinct analysis from the one this Court did before, Your Honor. Now, there may be some overlap in what's the effect part when you look at what's a discriminatory effect and the burden when you get back to deciding is it an impermissible burden. But the rationale for this Court's decision was not that we weren't burdened and not that interstate commerce was not burdened. I don't think you decided that. What you decided is the State had simply proffered a legitimate justification, in your view, for treating the two entities differently, and so therefore they weren't being discriminated. That, to me, is a different legal question and didn't answer the question here. And Exxon, I think, you know, is – Did you say that our prior decision did not decide that interstate commerce was not burdened? Yes, Your Honor. Your first decision did not decide that. Your first decision decided that it wasn't – Well, it certainly did. That was the whole purpose of the discussion, to show that there was no burden on interstate commerce. Well, the way that I read the decision, Your Honor, is that it decided that it wasn't discriminatory, which is the first prong of the Dormant Commerce Clause analysis. So the first prong is, is it discriminatory? And if it treats similarly situated entities differently because of being in-state and out-of-state, then the State has to justify it under strict scrutiny, and it would surely have failed. And this Court said, no, these two entities, the State has a basis for treating them differently, so it doesn't discriminate. It doesn't fail the first prong of the Dormant Commerce Clause test. But then if I can quote from your opinion, it says, this is, quote, not the end of the analysis. Quote, even though – and this is at 528 – even though not discriminatory, the laws may still be invalidated if the burden they place on interstate commerce outweighs their benefits. And so – Okay. Just to talk for a minute about the benefit. I gather you'd agree that the best you could do on the benefit level would be a remand for a factual determination. You have some facts. They claim your facts are not facts. They have some facts. And so I don't see – on that issue, you – how could you possibly prevail on the record if that became relevant, which would only become relevant if there were a cognizable burden, right? Yes, Your Honor. I think that there may be some disputes of fact, as you say, on one portion of the analysis, but I think that we could win as a matter of law on the existence of less restrictive alternatives. I mean, there are multiple statutes and regulations on the books that already address this very same point. But if you get into less restrictive alternatives, you just told us that the whole point here was that we're not doing strict scrutiny. But if we get into less restrictive alternatives, then we are doing strict scrutiny. I mean, Pike has a relatively old case at this point, and it seems to me that some of the later cases at least shake it some, on that point, for example. Well, I think that, you know, maybe the buzzwords, less restrictive alternatives, you know, sounds more in strict scrutiny. But I think it is relevant to whether or not the interests are being served, that there are other ways that in – under the Pike analysis, Pike expressly considers this, whether the interest, quote, could be promoted as well with a lesser impact on it. Well, Pike did. I mentioned – said it. I don't know if it considered it and said it. But I don't know that any later cases – is there any later case that's ever done that? I'm standing right here. I can't – you know, I can't pop one to my bed. I mean, certainly, Pike's analysis has not been repudiated by the Supreme Court, and the Court quotes this language from Pike. So I mean, I think another point of view... Is that that language? I'm just wondering about that language, as opposed to the balancing language. You know, standing here, I can't give you a site, but I would certainly think so. I – Pike's certainly not... Your time, but you're beginning to eat into your... Thank you, Your Honor. Can I make one more point?  Which is, I think, another inquiry in the interest analysis where we would have a good argument as a matter of law. But to be sure, just to be clear, we would be happy to have a trial and fight this out. So if that's – that's certainly preferable than where we are now. But another factor that would be considered is that the State's justifications for its law can be undermined by its failure to include all the relevant people within the restrictions. And here, the State is allowing dispensing optometrists to co-locate. But the evidence in the record, in common sense, would suggest that the same sort of profit motive that might drive – you know, that allegedly drive the plaintiffs, the optometrists who are affiliated with the Knox-King Plains and the plaintiffs, would... Well, the argument, as I understand it, is that it isn't their – it's one thing to have it be your profit motive. It's another thing for it to be somebody else's profit motive, where you're not making the decisions about how to balance your ethical and profit and commercial interests. Well, in some ways, Your Honor, I think that actually cuts against the State, because I think if an optometrist owns its own practice and is getting a quarter to 50 percent of its income from the sale of eyewear, that it may have higher – he or she may have higher pressures. And again, at a minimum, at least there would be a factual dispute on this question. If I may reserve the balance of my time. Yes. You have three minutes. We hear from the State. Good morning, Your Honors. Sherry Wodeika, Deputy Attorney General representing defendants. May it please the Court. Your Honors, if a transfer of loss of profits from an out-of-state business to in-state business, if that was sufficient to show a violation of the Commerce Clause, then there would be no State statute that would be safe from attack. That's why Commerce Clause cases are – Why is that? Because every case that is filed based on the Commerce Clause is filed because that company or entity assumes that it will be losing income or profits and that some State law precludes that. And so that's why that is brought.  They may be losing money, but they may not be losing it to interstate entities. I'm sorry, excuse me. They may be losing money, but they may not be losing it to interstate entities. They may be losing money, but – Not losing it to interstate entities. In other words, there is – is there something inherently interstate, intrastate about the optometrists here, which makes this case somewhat unusual in the sense that one part of the package is inherently local. Is that right or not? It's not, Your Honor. The treatment of the eye, an eye examination, is a local event. It happens through businesses in the State of California. It's at a location in the State of California regulated by the State of California. Opticians and doctors are regulated here. There are residents here for the most part. This is an in-State event. And what plaintiffs are challenging, loss of profits basically, is what the gravamen of their complaint is, has no impact on anyone else in any other State, as Judge Carlton stated in the decision below. Well, Judge Carlton – I mean, I must say that I've read that opinion as a little bit annoyed at us and thinking, well, if that's what they're going to say, then my earlier opinion is out the window and they've already decided this. But if they'd already decided it, why do we send it back? Your Honor, I'm sure that this Court wanted to give both parties an opportunity to brief the Pike issue because the issue that was presented to this Court in the prior appeal had to do with discriminatory effects. Well, is there anything they could have shown, sort of in the realm of imagination, that would have satisfied Pike? I mean, just some kind of burden that wasn't covered by the earlier case? Your Honor, I can't think of anything. And they have been unable to come up with anything for 10 years. This case has been going on for 10 years. If there was some kind of additional burden on interstate commerce, they would have come up with it before now. Also, there's no reason to remand this case because Judge Carlton and this Court, it's not necessary to rely on the facts, but from a legal standard, as a matter of law, the State prevails on a Pike analysis. First, because plaintiffs have failed to show that there's any burden on interstate commerce. And second, this Court and the United States Supreme Court in Williamson v. Leoptico have said that these laws have a beneficial effect. Also, this Court in Alaska Airlines has said that the law ---- Where did we say it had a beneficial effect? Where did we say it had a beneficial effect? In the prior appeal. No. I mean, we said they say it has a beneficial effect. You say it has a beneficial effect. Right. I believe Judge Huggs said that these laws ---- Are said to have had. Well, what he said was California is sought to protect optometrists and ophthalmologists as healthcare professionals from being affected by subtle pressures from commercial interests. And the United States Supreme Court, that's following the United States Supreme Court precedent in Williamson v. Leoptico, when they said that legislation that separates doctors from optical retail stores has a legitimate legislative purpose to ---- A rational legislative purpose. Correct. You're right, Your Honor. And so is that the same standard, and it could be, that we are talking about with regard to an illusory benefit? Yes. And this Court in Alaska Airlines addressed that issue when they said that the only or you said that the only way a legitimate law would violate the Commerce Clause under Pike analysis is if the particular means chosen to achieve its goals were irrational, arbitrary, or unrelated to those goals. And these laws, obviously, California has a strong interest in protecting its doctors from commercial influences, and separating doctors from commercial influences is a rational method in achieving that goal. So if they could put on a record that demonstrated that, as a matter of fact, with regard to the impact of the adverse impact of profit motive on the sale of, on eye exams because the same person is selling eyeglasses, there's no difference between optometrists operating on their own and optometrists working for chain opticians, that wouldn't matter. I mean, is that your ultimate position, it wouldn't matter? Right. Because? Because under the Pike standard, it is their burden to show that there are other alternatives out there that will protect the State's interests as well as these laws do. But I'm positing a situation in which they demonstrated that the State's interests are, they found 75 experts to come in and say the State's interests are, the purported interests are absolutely not being forwarded because the optometrists operating on their own have all the same problems. Even if that is so, Your Honor, under Exxon, even if the public is being harmed by not having doctors inside optical stores, that's an issue for the legislature. That goes to the wisdom of the statute, not to its impact on interstate commerce. No, I'm asking about the Pike benefits analysis. Does the Pike benefit have to have some existence in fact or can it just be something the legislature has had that has, that absolutely does not operate on the ground? It has to have some. I mean, somebody might think it, but when you go to figure it out, it actually is not happening. It has, it can't be illusory, but these laws are obviously not illusory. The lower record has many, many examples of, from doctors, of instances where they have felt pressure from commercial interests to increase eyewear at the expense of patient health and safety. But that's not, even if that didn't exist, the standard is still, you look at whether or not these laws are rational. Are they rationally related? Yes, they are. It's not logical to think that they are not rational to achieve the State's purpose in protecting doctors' professional judgment. There are several cases that follow Exxon and Amnesty. Are you suggesting that the plaintiffs could never have an opportunity or could never legally show that the benefits, the asserted benefits are illusory? Under this statute, yes. There are statutes out there that have been struck because they are illusory or their burdens are clearly excessive. The case with the 55 feet and the 65-foot truck, wasn't there, wasn't that resolved at least partly on a demonstration that, in fact, the 55-feet trucks were not safer than the 65-foot trucks? Yes, Your Honor. That was Raymond Motor. Right. But in that case, the State's expert agreed with the plaintiff's expert. The State put on no evidence. Right. So let's suppose that happened here. Suppose the State expert and the defendant's expert both agreed that optometrists operating on their own and optometrists working for other people are both likely to prescribe, to slant their exams in favor of selling more glasses. You know, that would be an issue for the legislature because they could put on hearings and have panels, and that would be very difficult for a court to make that determination. But I suppose if it was identical to Raymond, that kind of situation where no reasonable expert could disagree with plaintiff's experts, then possibly the laws might be illusory. But still, it's not for this Court to determine the validity of the laws, whether you like them or whether you don't. The responsibility of the Court is to determine whether or not they have a rational relationship to California's interest in protecting doctors' professional independence. I see. I think the only way the State prevails at this stage is if the burden, the asserted burden is not cognizable. Otherwise, I think there's a tribal issue of fact. Your Honor, there is no burden on interstate commerce. If there was, Exxon would have been decided differently, and many cases following Exxon. In Exxon, the petroleum refiners, they wanted to keep competing with the in-state gasoline service stations, but they were prohibited from doing that because of State law. Well, the difference in Exxon was it's sort of the obverse of this, and maybe that doesn't matter, but it seems to me it was the obverse, in that the refineries were inherently out-of-state. But the retail competition was not, was both in-state and out-of-state. Here we have the optometrists, at least I'm positing, being inherently in-state. But the opticians, the competition, isn't inherently in-state or out-of-state, but on the ground, it happens to be largely out-of-state, if you call out-of-state meaning incorporated out-of-state. Now, you don't disagree that that counts, I gather, even though they could be incorporated in-state, but they happen to be incorporated out-of-state. The only fact that makes this an interstate commerce case at all is that their headquarters just happen to be in Ohio instead of Sacramento. But they're operating wisely here. They're operating here with people, companies, space, so on. What about my question about Knox Keene and people versus coal and the fact that we seem to be operating on hypotheticals for some reason? I mean, if this is the law of California, why isn't it the law of California? Why is everybody saying this is what would happen when, apparently, why don't we look at what does happen? I mean, here, something is the law of California. Now, people versus coal ultimately didn't decide exactly whether these could operate or couldn't operate. Has anybody ever decided? Is there a regulation? Is the AG enforcing anything? What's happening on the ground? At this point, the state is waiting to see how you resolve this case, and if these laws are upheld, from that point, the Attorney General will go forward and make decisions on what will happen. But in terms of people versus coal, that case very clearly said, stated the California Supreme Court told us that optical stores are required to comply with the business and professions codes, including 2556 and 655. They cannot maintain doctors on their premises. And Noxkeen does not exempt them. I thought you said specifically we're not deciding whether these are valid or invalid collocations. We're just saying that the ñ that there's no Noxkeen exception. Correct. There's no Noxkeen exception or exemption. Your Honor, in Ford Motor Company versus Insurance Commissioner of Pennsylvania, the Third Circuit has said that if companies make decisions on how they want to compete in the market, whether they want to be in the market at all, that's part of their ñ their right, but they can't expect that they won't be required to comply with Federal and State laws. And you can't invoke the Constitution at every turn to circumvent State and Federal regulations to protect their rights. I mean, I find this whole set of law completely confusing. Well, fine. But take the 55-foot, 65-foot case. I mean, obviously, their complaint there was they didn't want to comply with the State 55-foot law. That was their complaint. They ñ no one was telling them they couldn't come in. It's just if they came in, they have to have a 55-foot truck. So how does that comport with your Ford example? That goes to the issue of being illusory. And in that case, there were experts on both sides, but the State's expert agreed with defense expert and said, yes, I don't think there's any safety difference between 65-foot-long trucks and 55-foot-long trucks. So it's not true that you can't have a Dormant Commerce Clause complaint if you're unwilling to comply with State law. That's ñ well, you always have. The question is you have to invalidate the State law. It's always about complying with State law. That's what the case always is about. Well, that ñ in that case, the law was not rational, and plaintiffs in that case were able to determine that that law was not rational. Can I ask one other question, which I will ask Ms. Maynard as well? There's a case now pending on cert in the Supreme Court called Direct TV. Do you know about that? No, Your Honor. Okay. I apologize. I just wanted to make the distinction between these facts and Raymond Motor Company. In this case, in the record, there are declarations under penalty of perjury. There are ñ there's deposition testimony from doctors who have worked inside of Linscrafter's stores. And there's evidence to the contrary, or at least to the contrary as to the illusoriness of the benefits, saying that the optometrists are no better and so on. And there's also a dispute about what the various surveys mean and so on. Is there any way at all you could prevail on that issue without a trial? Yes, Your Honor. How? By those laws are rational, whereas in Raymond, the plaintiff's expert agreed that the laws there were not rational. There's no expert in our case that has ñ that agrees with plaintiffs that these laws are irrational and unreasonable and are arbitrary, and therefore don't have any validity. In fact, there's just the opposite. So that's how this case is distinguished from Raymond and from Castle. And in Castle ñ So if I can summarize your position, it seems to be that when we said you should go back and do a Pike analysis, there was really no Pike analysis to be done because there was, as a matter of law, no burden, and that's the end of the story. At that point, we had not been told exactly what the burden was, what plaintiffs had assessed or was stating what the burden was. After they had briefed the issue, it really boils down to just they are losing profits. And there's not one case out of all of the cases that have been cited in plaintiff's case where loss of profits was a sufficient burden to strike a statute under Pike. The three areas where burdens were sufficient have to do with extraterritorial effect. They have to do with placing an unreasonable burden on market entry and on added costs. And I think plaintiffs in this case have conflated the ñ their argument of lost profits with added costs, and there's really a huge difference between those two. Because if a statute is going to add costs on an out-of-state company's right to do business in the state, that goes to the issue of discrimination, whereas if a statute such as the one in this case and in Exxon says that a state is permitted to regulate the type of business model that ñ that a company wants to use in the state, that that is a permissible state regulation and does not impermissibly burden interstate commerce. And those are the facts that we have here. And there's no reason to remand this case, because the facts are established at this point. We know what the burden is. Whatever the ñ however much the burden is, it's ñ comes down to loss of profits versus the United States Supreme Court saying the benefits of what these laws are. And also there are ñ Kagan. I remember Judge Carlton said in the first opinion that this is a classic market entry case. And you say that's not so. Yes. I just ñ yes. We disagree with that. This is not a classic market entry case. Market ñ classic market entry cases would be like Medigan, where the new business has to get a certificate of necessity from a state employee on whether or not they can enter the business. Or it's like Yamaha versus Jim's Motorcycle, where an in-state competitor has the right to challenge at a hearing the ability of a competitor to enter the state. Those are classic market entry cases, not this one. This one ñ this case before you now is on all fours with Exxon, with Ford Motor Company versus Texas Department of Transportation, with Allstate versus Abbott, with International Truck versus Bray, with Haas versus Oregon. In all of those cases, business of the form that the plaintiffs wish to do business with was prohibited under state law. So in Ford Motor Company, Ford was precluded from owning car dealerships in the state of Texas in competition with in-state dealerships. That ñ I'm sure that that was a considerable cost to Ford. Also, in Allstate, they were ñ they were prohibited from owning auto body shops where ñ by an insurance company. So just like in this case, out-of-state insurance companies were able to go into that state and sell insurance, they just were prohibited from owning auto body shops. Just like in this case and in Exxon, plaintiffs are prohibited from maintaining doctors on their premises, but they are not prohibited from selling eyewear in the state. I mean, if the optometrists weren't selling eyeglasses, they'd obviously have no legitimate problem. In other words, if they were prohibited from having optometrists on their ñ on their premises, and the optometrists weren't competing with them by selling eyeglasses, there'd be no case. Their problem is that the optometrists are selling glasses, but they can't have optometrists. That's their complaint, which is somewhat different, although maybe it's in the realm of the first issue and not the second issue. I don't know. I mean, maybe it's ñ more goes to the discrimination issue. But that's their basic complaint. And so in that way, I think it's somewhat different from the other cases because there's not just a ban on vertical integration, there's only a ban on some kinds of vertical ñ vertical integration by some people. So is that ñ are all your cases still relevant, I guess, is the question. I believe they are because they prohibit one business entity from choosing their preferred business model to use in that state. And that is the same situation that is here. LensCrafters, the optical industry, they're not precluded from using ñ from selling business model. And as Judge Huggs said in the prior opinion, there's a big difference between doctors and their responsibilities, their ethics, than there is between optical stores. And optical stores, 100 percent profit comes from the sale of eyewear. They only incidentally have exams on the premises, where a doctor's primary concern is the health and safety of patient vision, and they only sell eyewear incidental to the provision of medical care. Okay. Thank you. I've got a few minutes here for rebuttal. Thank you, Your Honor. This is a cognizable burden here. This shift of business from out-of-state entities to in-state entities as a result of a state statute is a cognizable burden under PIPE. The Supreme Court's decision, Minnesota v. Cloverley, primarily, is, I think, an apt in that regard. Now, to be sure, the plaintiff in that case lost on the PIPE balancing, but it wasn't because there was no cognizable burden, and we just want our chance to prove our case, which we thought this Court gave us on the last remand. The distinction, I think, to resign between the last inquiry and the last opinion and the inquiry here really boils down to who's got the burden of proof. The Court accepted their distinction for purposes of letting them escape strict scrutiny, and so now we have to bear the burden of showing, meeting the PIPE second inquiry, which is, is it an impermissible burden on interstate commerce to let in-state entities operate in the way that we want to operate, but not out-of-state entities? And so I think we have to bear that burden. Kagan. But every time you say that, I say, but no one's stopping out-of-state entities. It isn't a rule about out-of-state entities. If somebody set up a LensCrafter competitor in California, they'd have the same problem. But it's the facts on the ground, though, that matter in the Commerce Clause challenge. So to be sure, if someone's – if there was a comparable LensCrafter set up within California, then we might have a harder case on our proof. But it wouldn't mean we don't have a cognizable burden. And that's what the district court held. So – Are you only talking about lost – asserted – allegedly lost profits? Well, no. We're talking about a shift of business from out-of-state entities to in-state entities, measured by the amount of profits that are going to be available to in-state entities if the state – Well, you – why couldn't LensCrafters come in and have a massive advertising campaign, lower prices, all that? The evidence shows that only 4 percent of the market in California is opticians who don't offer ISA. No, what Judge Pius is saying is if you – I mean, presumably, the benefit of being a large interstate, supposedly, chain is that you can do things a lot cheaper. And you do them right on the spot and so on. And if you advertise all that, who says that you're not going to have plenty of business? There's no evidence in the record that would support the view that there is a market for such a business. So the state hasn't put any evidence in the record. But again, this debate about the facts just goes to show we should get our chance to have the evidence weighed. So there is a cognizable burden that we've alleged, and we should get to try to prove it under PIKE. You heard my question about the DirecTV case. Do you know about it? I'm aware of it, Your Honor. And right now the court has called for the abuse of the solicitor general as to whether or not to grant cert. And suppose there were to grant cert in that case. Would that matter to us? Should it matter to us? It could matter, Your Honor. I think it more directly bears on the question you decided the first time around. That's true. But I think it could, to the extent it clarifies or addresses Exxon and the meaning of Exxon, it could bear on this. We would certainly be content to have this court stay this case, you know, pending the Supreme Court's resolution of that one if the court were to grant cert. I expect, given the normal timing, the court would decide that before it breaks or decide whether to grant cert before it breaks for the summer. If I could make a couple more points. Quickly. You asked me when I was up the first time if there were any more recent PIKE cases in the Supreme Court that had applied the less restrictive alternatives. And, yes, on page 50 of our brief, we cite Bindex, Autolite, and Great Atlantic and Pacific Tea Companies as examples of cases in Bindex determining that the alleged benefits of the statute were illusory where another statute served the very same purpose. And the statutes that you say are serving the same purpose are the ones that say that optometrists are essentially ethical rules for optometrists, saying that optometrists can't have unnecessary services and so on. The other provisions are on page 17 in footnote 10 of our opening brief, Your Honor, and they do things like prohibit oversubscribing, prohibit kickbacks and fee splitting. And we cite in our brief the State asserted below, in the context of trying to show that we don't have standing, that there were other statutes on the books that already have a standing, so that, you know, no, we wouldn't win anything by winning here. And that's at the excerpts of record 670 to 72. And I do think it is highly relevant that the State has excluded the dispensing optometrists from these rules and that under Edgar B. Might's analysis, it does a lot to undermine their asserted interests here. In that case, the Court found that the State's asserted interests were undermined because for the failure to cover certain tender offers. I think an analogy here is appropriate to that. And then in answer to your questions about Castle and Raymond, yes, the facts are what matter, and in those cases, significantly in Castle, there was a trial. So we'd like to have our chance at at least a decision that there is no dispute or to put on our proof. The State has, it's my understanding, the State has stayed enforcement of the restrictions pending this lawsuit. In answer to another question you asked me. And in conclusion, all we want is a remand. We would be perfectly happy with a one-paragraph per curiam that just asks the District Court to do what you ask them to do the first time. Thank you very much. Thank you. Thank you for your arguments, counsel. Interesting case. Matter submitted at this time.
judges: Hug, Paez, Berzon